IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SCOTT GINSBURG,                    §
                                   §
            Plaintiff,             §
                                   §  Civil Action No. 3:16-CV-2311-D
VS.                                §
                                   §
ICC HOLDINGS, LLC, and             §
TIM McGRAW,                        §
                                   §
            Defendants.            §

MEMORANDUM OPINION
AND ORDER

In this action arising from defendants' alleged misrepresentations and breach of
contract in connection with plaintiff Scott Ginsburg's ("Ginsburg's") investment in
defendants' medical marijuana[1] business, defendants move to dismiss under Fed. R. Civ. P.
12(b)(6) and 9(b). For the reasons that follow, the court grants the motion in part and denies
it in part and grants Ginsburg leave to replead.

I

In December 2015 defendant ICC Holdings, LLC ("ICC") and its Chief Executive
Officer, defendant Tim McGraw ("McGraw"), contacted Ginsburg to solicit funding to
support their medical marijuana business.[2] In connection with defendants' solicitation

_____

[1]The court usually spells the term marijuana according to its statutory spelling:
"marihuana." *See, e.g.,* 21 U.S.C. § 841(b)(1)(A)(vii). In this case, however, for ease of
reference the court will follow the spelling used in the parties' briefs.

[2]In deciding defendants' Rule 12(b)(6) motion, the court construes Ginsburg's fourth
amended complaint in the light most favorable to him, accepts as true all well-pleaded factual

efforts, McGraw sent Ginsburg a Private Placement Memorandum ("PPM") dated March 2015. The PPM "reasonab[ly] estimate[d] . . . the projected revenue for medical cannabis sales in Illinois" to be $1,115,910,000, and projected that ICC would have earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $46,817,840 in 2016, and $53,065,367 in 2017. Ds. App. 14, 29. It also stated, on its financial projections page: "[t]he projections are 'forward looking statements' and were not prepared with a view to public disclosure or compliance with published guidelines of the commission or any state securities commission. The company advises all prospective investors to pursue their own independent investigation with respect to the projected financial information included." *Id.* at 29 (bold font and capitalization omitted).

Following Ginsburg's receipt of the PPM, he asked McGraw whether ICC would prepare and provide him a copy of audited financial statements. McGraw responded that ICC's bank required audited financial statements and that he would provide copies of them to Ginsburg as they were prepared.[3] Allegedly in reliance on McGraw's representations and

_____

allegations, and draws all reasonable inferences in plaintiff's favor. *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

[3]In a June 13, 2016 email, McGraw told Ginsburg, in response to his request for detailed month-end and quarter-end financial statements, that summary financials were only sent "as a courtesy," and that Ginsburg was not entitled to have access to quarterly, monthly, or detailed financial statements, and, in a separate email, that "[w]e do not have audited financials if that's what you need." 4th Am. Compl. ¶ 12(b).

the statements in the PPM, Ginsburg loaned ICC $7 million, as evidenced by a January 19, 2016 promissory note ("January Note") in that same amount, convertible into Class B Units in ICC.

In February 2016 McGraw and ICC sought additional funding from Ginsburg. In a February 4, 2016 email to Ginsburg, McGraw stated: "[t]he Holland deal is ours now. Revolution [an operating arm of ICC] will take operating control. . . Moral of the story is that we are in the driver[']s seat." *Id.* at ¶ 12(d) (alterations in original). McGraw also stated that the so-called "Holland deal" will "make Revolution the largest producer on the planet."[4] *Id.* In a February 17, 2016 email, McGraw stated that ICC's projected financials should show Ginsburg "how lucrative being our lead investor on these deals is and how [McGraw] ha[d] structured them so [Ginsburg] [would] get [his] capital back quickly"; that "[w]e will overnight be bigger than GW"; that ICC's patient and facility ramp-up was slower than initially projected because of "decisions made by our Governor in Illinois," but that "even so the future is [expletive] bright"; and that ICC "stands alone at the top of cannabis." *Id.* ¶ 12(e) (some alterations in original). That same day, ICC's CFO, Jonathan Charak ("Charak"), emailed Ginsburg 3-year forecasted financials reflecting projected EBITDA of negative $1,452,781.00 for 2016, but projecting that in 2017, ICC's EBITDA would grow over $4.5 million to $3,052,688.00 and that ICC would have a positive net cash flow of $52,688.00. The 3-year forecast also projected EBITDA growth in 2018 of nearly 700% to

---

[4]McGraw later learned that ICC never, in fact, finalized any deal in Holland, and Revolution never had operating control of any Holland-based business.

$21,104,488.00, with positive cash flow of $19,104,488.00.

On February 22, 2016 McGraw stated in an email to Ginsburg that if Ginsburg provided $2,250,000 in exchange for another Class B convertible note, McGraw would also give Ginsburg 150,000 Founders' Units from McGraw's personal holdings. On March 3, 2016 McGraw emailed Ginsburg, stating that ICC needed cash to pay subcontractors that week or they would walk off the job. McGraw stated:

> [t]here is HUGE demand for [marijuana extract] and we can make a [expletive] load as soon as we get the final inspection of the labs done. Which if we pay today or tomorrow can be next week. We want more revenue but we are sitting on a pile of money because the labs aren't online.

*Id.* at ¶ 12(h) (alterations in original). Allegedly in reliance on McGraw's and ICC's statements and projections, Ginsburg executed a second promissory note ("March Note") in the amount of $3.6 million, convertible into Class B Units in the company. Under the terms of a Funding Disbursement and Interest Reserve Agreement ("Reserve Agreement"), Ginsburg was to "hold back" $1,260,000 from the $3.6 million stated value of the March Note, which was to be used to service 12 months of ICC's interest obligations on the $10.6 million combined total of both notes. Although Ginsburg only wired $2,340,000 to ICC in March 2016 (not the full $3.6 million), he contends that he never executed the Reserve Agreement and never consented to its terms.

Ginsburg alleges that he later learned that the statements and projections on which he had relied had no basis in fact "and were, stated mildly, wildly optimistic forecasts." *Id.* at ¶ 12(j). Although ICC had projected 2016 EBITDA of $46,817,840 on January 6, 2016, ICC

emailed Ginsburg on February 17, 2016 (approximately one month after it received $7 million in funding from Ginsburg) forecasting 2016 EBITDA of *negative* $1,452,781.00. These same forecasts (sent halfway through Q1) showed Q1 EBITDA to be estimated at negative $410,850. Then, on May 16, 2016, after Ginsburg executed the March Note, McGraw emailed Ginsburg providing 5-year projected financials showing the actual Q1 EBITDA to be negative $1,932,113—a loss more than $1.5 million greater than the projections provided to Ginsburg halfway through that quarter, when defendants were seeking additional funding from Ginsburg. The May 16, 2016 projected financials also showed revised 2016 EBITDA to be projected at a $4,885,755.00 loss, which was three times greater than the projections provided to Ginsburg on February 17, and more than $50 million less than the EBITDA projected in defendants' emailed estimates on January 6, 2016.

Ginsburg alleges that defendants also materially misrepresented having specialized knowledge about the status of marijuana legalization efforts nationally and internationally, in general, and the status of the Illinois legislature's position and timetable for getting laws changed, which would expand the potential Illinois customer base for medical marijuana usage. Although the PPM stated that "[a]s cannabis gains support for full legalization/recreational use, it is another indication that the industry is set to rapidly expand, providing both investors and operators with unprecedented opportunities," such "full legalization" never materialized in Illinois or in the remainder of the United States. *Id.* ¶ 13(a). In addition, on March 10, 2016, allegedly "amidst discussions between ICC and [Ginsburg] regarding [a] potential second round of funding," McGraw stated in an email to

Ginsburg that, through ICC's efforts, a law was about to be enacted that would considerably

expand the permissible uses for medical marijuana, thus significantly increasing the market

and demand for ICC's products.[5]  *Id.* at ¶ 13(b).  But neither chronic pain nor Post-Traumatic

Stress Disorder was added to the list of permissible uses for treatment by medical marijuana,

as McGraw had indicated, nor were the other indicated changes enacted into law.

Ginsburg alleges that he justifiably relied on the material misrepresentations made by

ICC and McGraw when he provided funding to ICC by making loans that could be converted

into Class B Units of ICC.  He asserts that McGraw and ICC continue to materially mislead

potential investors; that, on May 6, 2016, McGraw emailed him an "Investor Presentation"

in preparation for the round of Class C Unit-convertible notes and failed to disclose ICC's

known risks (e.g., that favorable legislation might not be passed), the probability that such

risks would materialize, or the anticipated magnitude of such materialization; and that

defendants "continue to display an ongoing pattern of deceit, over-inflation of projected

earnings, and under-estimation of known risks."  *Id.* ¶ 15.

By letter dated July 6, 2016, Ginsburg made demand upon ICC to bring the debts on

the January Note and March Note (collectively, the "Notes") current by paying the accrued

interest, which was due three months after the effective date of each note.  Ginsburg alleges

---

[5]According to Ginsburg, McGraw stated: "[w]e have all support we need on the republican side and the leaders of both the house and senate as co-sponsors. . . .  Chronic pain and [Post-Traumatic Stress Disorder] will change everything[, as will] taking out the doctor recommendation language and adding the ability to send records into public health for certification if doctor or hospital group won[']t."  4th Am. Compl. ¶ 13(b) (some alterations added).

that ICC was to have made the interest payments on or before August 4, 2016, but they were not paid.  In April 2017 Ginsburg notified ICC that the interest then owing under the Notes exceeded $1,260,000 and demanded that ICC bring the Notes current within 20 business days, which ICC failed to do.

Ginsburg sues McGraw and ICC alleging claims for breach of contract based on ICC's alleged default on the Notes; common law fraud, violation of Tex. Bus. & Com. Code Ann. § 27.01; violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5; violation of § 20 of the Exchange Act, 15 U.S.C. § 78t (as to McGraw only); violation of Tex. Rev. Civ. Stat. Ann. Art. 581-33(A)(2); violation of Tex. Rev. Civ. Stat. Ann. Art. 581-33(F) (as to McGraw only); violation of the Illinois Securities Law of 1953, 815 ILCS 5/12(F), and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

McGraw and ICC move to dismiss Ginsburg's fourth amended complaint under Rules 12(b)(6) and 9(b).  They contend that because the purpose of the Notes is to fund the cultivation, possession, and sale of marijuana, in violation of federal law, the Notes are void and unenforceable because they contravene public policy.  McGraw and ICC also maintain that, even if the Notes are enforceable, the court should dismiss Ginsburg's claims because the fourth amended complaint does not plausibly allege that McGraw and ICC have breached the Notes, made any misrepresentations, or failed to disclose risks, and that the fourth amended complaint fails to state any fraud-based claims with the requisite particularity.

Ginsburg opposes the motion.

## II

### A

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of plaintiff['s] [fourth] amended complaint by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (internal quotation marks and brackets omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To survive a motion to dismiss under Rule 12(b)(6), plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (brackets omitted) (quoting Rule 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678

(citation omitted).

To obtain a Rule 12(b)(6) dismissal based on an affirmative defense, the "successful affirmative defense [must] appear[] clearly on the face of the pleadings." *Cochran v. Astrue*, 2011 WL 5604024, at *1 (N.D. Tex. Nov. 17, 2011) (Fitzwater, C.J.) (quoting *Sivertson v. Clinton*, 2011 WL 4100958, at *2 (N.D. Tex. Sept. 14, 2011) (Fitzwater, C.J.)). In other words, defendants are not entitled to dismissal under Rule 12(b)(6) based on an affirmative defense unless Ginsburg "'has pleaded [him]self out of court by admitting to all of the elements of the defense.'" *Id.* (alteration in original) (quoting *Sivertson*, 2011 WL 4100958, at *3).

B

"Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Turner*, 2011 WL 3606688, at *2 (quoting *Benchmark Elecs.*, 343 F.3d at 724) (internal quotation marks omitted). More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare*

*Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Because Rule 9(b) must be "read in conjunction with [Rule] 8 which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," "punctilious pleading detail" is not required. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.) (internal quotation marks omitted) (quoting *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990)). "The court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (citation omitted).

## III

The court begins with Ginsburg's breach of contract claim based on ICC's alleged default on the Notes and defendants' contention that this claim is precluded on the ground that the Notes are void and unenforceable.

## A

Defendants move to dismiss Ginsburg's breach of contract claim, contending that the Notes are void and unenforceable because their illegal purpose contravenes public policy. They maintain that, under the Federal Controlled Substances Act ("CSA"), marijuana is a Schedule I controlled substance, the use of which is prohibited under any circumstance; that the CSA makes it unlawful to manufacture, distribute, dispense, or possess any controlled substance; that the CSA also makes it illegal to profit from the manufacture or sale of marijuana; that loaning money to support a business cultivating, selling, or distributing

marijuana exposes individuals to other federal laws that criminalize aspects of the marijuana business; that Ginsburg has admitted to this court that he invested $10.6 million to support a business that cultivates, sells, and distributes marijuana; and that by investing in ICC to finance the cultivation, possession, and sale of marijuana, Ginsburg has knowingly violated countless Texas and federal drug laws.

Ginsburg responds that, as part of their effort to obtain funding for ICC, defendants misrepresented that marijuana would soon be legalized in Illinois and nationwide, in large part due to ICC's efforts, and that defendants should not be permitted to benefit from their wrongdoing; that the Notes on their face do not reflect an illegal purpose that is against public policy because the CSA does not prohibit an individual from "profiting" from a business involving controlled substances; that the cases on which defendants rely are factually distinguishable; that the "ultimate object" of the Notes was not to acquire ownership in ICC's marijuana business, but rather for Ginsburg to loan funds to a business and to be repaid with interest from whatever source of funds or proceeds was available to ICC; and that no mention of any illegal purpose exists within the four corners of the Notes, and that the Notes do not identify any purpose for the funds being loaned by Ginsburg to ICC.

Defendants argue in reply that Ginsburg did not lack knowledge of the business in which he was investing, and that, viewed as a whole, Ginsburg's investment with ICC plainly had as its ultimate object the acquisition of an interest in, and the operation of, a marijuana dispensary; that the parties' agreement included an ownership option in the defendant company, and that whether Ginsburg has as yet exercised that option is irrelevant to the

determination that the Notes have an illegal purpose; that the CSA specifically addresses profits derived from controlled substances[6]; and that the Notes indisputably provide capital to, and secure a right to acquisition of, an ownership interest in ICC, and therefore advance an illegal purpose under the CSA.

## B

The court must decide as a threshold matter what law to apply in determining the legality of the Notes and their enforceability. "[Q]uestions involving the effect of illegality upon a contract are determined by the law chosen by the parties, if they have made an effective choice." Restatement (Second) of Conflicts of Laws § 202 cmt. a (1971). In this case, the parties have effectively chosen Illinois law. Each Notes states: "[t]his Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of law provisions." 2d. Am. Compl. Ex. B at ¶ 7(g); 2d Am. Compl. Ex. C. at ¶ 7(g). The Notes are therefore governed by Illinois law. *See Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306-07(5th Cir. 2006) (stating that "[i]n diversity cases, a federal court must follow the choice of law rules of the forum state," and that "[t]he Supreme Court of Texas has recognized that contractual choice of law provisions should generally be enforced." (citing *Mayo v. Hartford*

---

[6]Defendants cite 21 U.S.C. § 854(a), which makes it unlawful to "use or invest, directly or indirectly, any part of . . . income [derived, directly or indirectly, from a violation of the CSA] in acquisition of any interest in . . . any enterprise which is engaged in . . . interstate or foreign commerce," and 21 U.S.C. § 856(a)(2), which makes it unlawful to "manage or control any place . . . and knowingly . . . profit from . . . the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

*Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990))).

Where it is alleged that an agreement contravenes a federal statute, however, the court looks to federal law to determine whether the contract is illegal or violates public policy, and, if so, whether the contract is unenforceable as a result. *See Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) ("the effect of illegality under a federal statute is a matter of federal law"); *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 174 (1942) ("When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield."); *see also N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) ("*NIPSCO*") ("When the statute is federal, federal law determines not only whether the statute was violated but also, if so, and assuming the statute itself is silent on the matter, the effect of the violation on the enforceability of the contract." (citing cases)); *Energy Labs, Inc. v. Edwards Eng'g, Inc.*, 2015 WL 3504974, at *3 (N.D. Ill. June 2, 2015) ("Since Defendants argue that a federal statute . . . makes its contract with ELI illegal, we must apply federal law to answer both whether the contract violates that statute and whether the contract is enforceable.").

Illinois' Compassionate Use of Medical Cannabis Pilot Program Act ("CUA"), 410 Ill. Comp. Stat. Ann. 130/25 (West 2017), which became effective on January 1, 2014, protects patients with debilitating medical conditions, as well as their physicians and providers, from arrest and prosecution, criminal and other penalties, and property forfeiture if the patients engage in the use of medical cannabis. *See Ball v. Madigan*, 2017 WL 1105447, at *1 (N.D. Ill. Mar. 24, 2017).  In addition to setting forth eligibility requirements for patients' use of medical cannabis, the CUA regulates the operation of medical cannabis cultivation centers and dispensaries and provides for the registration (renewable annually) with Illinois' Department of Agriculture and Department of Financial and Professional Regulation of up to 22 cultivation centers[7] and 60 dispensaries.  *Ball*, 2017 WL 1105447, at *1; *see also* 410 Ill. Comp. Stat. Ann. 130/85 and 130/115.  The CUA is effective until July 1, 2020.  410 Ill. Comp. Stat. Ann. 130/220.

Federal law, however, continues to prohibit use of marijuana, even by medical users. *See* 21 U.S.C. §§ 812 (controlled substances), 844(a) (penalties); *Gonzales v. Raich*, 545 U.S. 1, 26-29 (2005) (Congress' plenary power under Commerce Clause includes power to prohibit local cultivation and use of marijuana in compliance with state medicinal use statutes); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491-95 (2001)

---

[7]According to the fourth amended complaint, at the time ICC and McGraw solicited investments from Ginsburg, ICC had received its cultivation center license from the Illinois Department of Agriculture.

(holding that medical necessity is not a defense to manufacturing and distributing marijuana).

Marijuana is a schedule-I controlled substance under the CSA. *See* 21 U.S.C. § 802(6)

(defining controlled substance to include any drug or substance "included in schedule I . . .

of part B of this subchapter."); *id*. § 812(c), Schedule I at (c)(10). "By classifying marijuana

as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture,

distribution, or possession of marijuana became a criminal offense, with the sole exception

being use of the drug as part of a Food and Drug Administration preapproved research

study." *Gonzales*, 545 U.S. at 14 (citations omitted). The first section of the CSA provides

that "[t]he illegal importation, manufacture, distribution, and possession and improper use

of controlled substances have a substantial and detrimental effect on the health and general

welfare of the American people." 21 U.S.C. § 801(2). Illinois' enactment of the CUA does

not affect the fact that marijuana, including medical marijuana, is prohibited under the CSA.

As the Ninth Circuit recently explained in *United States v. McIntosh*, 833 F.3d 1163 (9th Cir.

2016):

> The CSA prohibits the manufacture, distribution, and possession
> of marijuana. Anyone in any state who possesses, distributes,
> or manufactures marijuana for medical or recreational purposes
> (or attempts or conspires to do so) is committing a federal crime.
> The federal government can prosecute such offenses for up to
> five years after they occur. *See* 18 U.S.C. § 3282. Congress
> currently restricts the government from spending certain funds
> to prosecute certain individuals. But Congress could restore
> funding tomorrow, a year from now, or four years from now,
> and the government could then prosecute individuals who
> committed offenses while the government lacked funding.
> Moreover, a new president will be elected soon, and a new
> administration could shift enforcement priorities to place greater

emphasis on prosecuting marijuana offenses.

Nor does any state law "legalize" possession, distribution, or manufacture of marijuana. Under the Supremacy Clause of the Constitution, state laws cannot permit what federal law prohibits. U.S. Const. art VI, cl. 2. Thus, while the CSA remains in effect, states cannot actually authorize the manufacture, distribution, or possession of marijuana. Such activity remains prohibited by federal law.

*Id.* at 1179 n.5.

## D

Under federal law, contracts that violate a federal statute on their face are "intrinsically illegal." *NIPSCO*, 799 F.2d at 273. For example, express agreements to violate the law are clearly illegal—such as agreements to restrain trade or commit a bank robbery—as are agreements that explicitly contradict a federal statute. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 78 (1982) (holding that agreement was illegal because it required plaintiff to pay a penalty if it breached a separate agreement to restrain trade). "In addition, even if the contract is not illegal on its face, courts have found contracts inherently illegal where one party must violate a statute or regulation to fulfill its obligations." *Energy Labs, Inc.*, 2015 WL 3504974, at *3 (citing cases); *see also, e.g., D.R. Wilder Mfg. Co. v. Corn Prods. Ref. Co.*, 236 U.S. 165, 172-73 (1915) (recognizing that if contract is "inherently illegal . . . the also elementary rule that courts will not exert their powers to enforce illegal contracts or to compel wrongdoing" may apply).

Because illegality of contract is an affirmative defense, defendants cannot secure dismissal of Ginsburg's breach of contract claim under Rule 12(b)(6) based on the illegality

of the Notes unless the defense appears clearly on the face of the fourth amended complaint. *See Cochran*, 2011 WL 5604024, at *1. For at least the following reasons, the court cannot conclude, based on the allegations in the fourth amended complaint, that the Notes are intrinsically illegal.

"To determine whether a contract violates a federal statute on its face, [the court] compare[s] the four corners of the contract with the language of the statute and related regulations and any interpreting case law." *Energy Labs, Inc.*, 2015 WL 3504974, at *4 (citing *NIPSCO*, 799 F.2d at 273). As explained above, the CSA prohibits a person from knowingly or intentionally manufacturing, distributing, dispensing, or possessing with an intent to manufacture, distribute, or dispense, a controlled substance. *See* 21 U.S.C. § 841(a)(1). On their faces, the Notes do not violate the CSA. Nothing contained in the Notes requires Ginsburg or ICC to manufacture, distribute, dispense, or possess marijuana. In fact, the Notes do not mention marijuana, ICC's business, or how ICC is to obtain the funds to repay its loan obligations. Instead, the Notes simply set forth the terms of Ginsburg's loans to ICC and provide for the repayment of the loans at a certain rate of interest.[8]

---

[8]Defendants appear to contend in their reply that 21 U.S.C. §§ 854(a) and 856(a)(2) specifically address profits derived from controlled substances. They fail to explain, however, how Ginsburg's loaning money to ICC in exchange for, *inter alia*, the right to acquire an ownership interest in ICC violates either of these statutes. Moreover, defendants did not raise any argument based on 21 U.S.C. § 854(a) or § 856(a)(2) in their initial brief. Because this court has long declined to consider arguments raised for the first time in a reply brief, *see, e.g., Jacobs v. Tapscott*, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) ("[T]he court will not consider an argument raised for the first time in a reply brief." (citing *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater, J.))), *aff'd*, 277 Fed. Appx. 483 (5th Cir.

Nor would granting relief in this case require that McGraw or ICC violate the CSA.[9]

Ginsburg seeks repayment of the $9,340,000 that he loaned ICC, plus interest, attorney's fees, costs, and expenses. Obtaining this relief does not require that ICC manufacture, distribute, dispense, or possess marijuana. *See, e.g., Mann v. Gullickson*, 2016 WL 6473215, at *7 (N.D. Cal. Nov. 2, 2016) (holding, in case where defendant failed to make payments under contract for sale of consulting business related to marijuana industry, that the court "could grant relief in this case that does not require [defendant] to violate the CSA. [Plaintiff]'s suit seeks [defendant's] full payment for the businesses he sold to her. Mandating that payment does not require [defendant] to possess, cultivate, or distribute marijuana, or to in any other way require her to violate the CSA."); *Energy Labs, Inc.*, 2015 WL 3504974, at *4 (where enforcement of contract would not necessarily require defendant to violate federal statute, and "by paying for the air conditioning units with non-federal funds, Defendants can fulfill their obligations under the purchase orders without violating

---

2008), the court does not address whether the enforcement of the Notes would result in a violation of 21 U.S.C. § 854(a) or § 856(a)(2).

[9]The Notes contain a "voluntary conversion" provision that states: "At any time prior to the Maturity Date, Investor may convert, in whole or in part, the outstanding principal amount of this Note and all accrued and unpaid interest thereon, into Class B Units of the Company at a price of $6.75 per Class B Unit[.]" 4th Am. Compl. Ex. B at 2. Ginsburg does not seek to exercise this option or allege that he ever converted or attempted to convert amounts due under the Notes into Class B Units of ICC. Accordingly, the court does not address whether the exercise of the conversion provision of the Notes would result in a violation of the CSA.

[statute]," contract, as pleaded, was not illegal).[10]  In other words, even if the Notes concern

an illegal object (i.e., a violation of the CSA), it is possible for the court to enforce the Notes

in a way that does not require any party to engage in illegal conduct.

E

Defendants argue that "Ginsburg is not entitled to any relief because the stated

purpose of his investment and the Notes, admitted by Ginsburg, is to finance the cultivation,

possession and dispensing of marijuana, a purpose that is in clear violation of the laws of the

United States and the State of Texas."  Ds. Br. 12.  But defendants fail to cite any authority

in support of their apparent position that, under federal and Texas law, a contract with the

purpose of funding an organization that is violating or intends to violate federal law is

automatically void or unenforceable.[11]

Generally, a contract entered into in violation of federal law or public policy is

unenforceable.  *See Kaiser Steel Corp.*, 455 U.S. at 77 ("There is no statutory code of federal

contract law, but our cases leave no doubt that illegal promises will not be enforced in cases

controlled by the federal law."); *id*. at 83 ("It is also well established . . . that a federal court

has a duty to determine whether a contract violates federal law before enforcing it.").  In

---

[10]Even assuming *arguendo* that it would violate the CSA for ICC to use the *proceeds* from its medical marijuana business to repay Ginsburg's loans, nothing in the Notes requires that they be repaid from the proceeds of ICC's medical monitoring business, and the face of the fourth amended complaint does not allege that this is the case.

[11]Defendants' reliance on Texas cases for the proposition that "under Texas law, a plaintiff may not recover in tort for claims arising out of an unenforceable contract," Ds. Br. 12, does not provide support for plaintiff's breach of contract claim.

practice, however, federal courts have taken a more flexible approach to the question of enforceability. *See, e.g., Paul Arpin Van Lines, Inc. v. Universal Transp. Servs., Inc.*, 988 F.2d 288, 290 (1st Cir. 1993) ("This general rule [of not enforcing illegal contracts] . . . is almost as much honored in the breach as in the observance."); *see also Nagel v. ADM Inv'r Servs., Inc.*, 217 F.3d 436, 440 (7th Cir. 2000) (noting that despite *Kaiser Steel*'s "ringing declaration, many cases continue to treat the defense of illegality to the enforcement of a contract as presumptive rather than absolute, forgiving minor violations and not allowing the defense to be used to confer windfalls." (citing cases)). "[T]he defense of illegality, being in character if not origins an equitable and remedial doctrine, is not automatic but requires . . . a comparison of the pros and cons of enforcement." *NIPSCO*, 799 F.2d at 273. In *NIPSCO* the Seventh Circuit held that the contract was enforceable, noting that the statute violated was "an anachronism—a regulatory statute on which the sun set long ago." *Id*. at 274. In *Resolution Trust Corp. v. Home Savings of America*, 946 F.2d 93 (8th Cir. 1991), the court observed: "[s]ome federal courts have applied this less-than-absolute rule and have refused to enforce illegal contracts only if the statute or regulation explicitly provides that contracts in violation are void, or if the interest in enforcement clearly outweighs the public policy against enforcement." *Resolution Tr. Corp.*, 946 F.2d at 96-97 (footnote and citations omitted). More recently, the Ninth Circuit explained that "[n]uanced approaches to the illegal contract defense, taking into account such considerations as the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability, remain viable in federal court and represent no departure from *Kaiser Steel* . . . as long as the relief ordered

does not mandate illegal conduct." *Bassidji v. Goe*, 413 F.3d 928, 937-38 (9th Cir. 2005); *see also Energy Labs, Inc.*, 2015 WL 3504974, at *3 ("[E]ven if a contract is illegal, it is not automatically unenforceable. Under federal law, the illegality of contract defense involves a balancing of the 'pros and cons of enforcement,' taking into account the benefits of enforcement 'that lie in creating stability in contract relations and preserving reasonable expectations' and the 'costs in forgoing the additional deterrence of behavior forbidden by the statute.'" (citations omitted)); *Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2004 WL 1933621, at *3 (S.D.N.Y. Aug. 30, 2004) ("The fact that a contract offends a federal statute or regulation does not, however automatically render it void or unenforceable. Unless the enforcement of a contract would require directing the precise conduct that a statute or regulation makes unlawful, 'the courts are to be guided by the overriding general policy . . . of preventing people from getting other people's property for nothing when they are purporting to be buying it.'" (citation omitted)).

Defendants do not address any of the foregoing factors in their motion to dismiss Ginsburg's contract claims. Instead, they appear to posit that, if a contract has an illegal purpose, it is automatically void and unenforceable. But, as explained above, federal courts do not take such a "black-and-white" approach to enforceability. Although the court does not suggest that a contract with the purpose of funding an organization that is violating or intends to violate federal law is necessarily enforceable, or that, in this case, the Notes are themselves enforceable, it concludes at the Rule 12(b)(6) stage that defendants have not established from the face of the fourth amended complaint that the Notes are void and

unenforceable.

IV

Defendants also move to dismiss Ginsburg's contract claim on the basis that he has failed to plead a plausible claim for relief.

A

Defendants contend that the Notes and the Reserve Agreement are the operative contracts between the parties; that, under the Reserve Agreement, Ginsburg withheld $1,260,000 to service 12 months of interest payments under both Notes, which carried the Notes through to April 26, 2017; and that ICC therefore did not breach its agreement with Ginsburg before May 24, 2017. Defendants next contend that, because Ginsburg demanded additional interest payments from ICC before May 24, 2017, sued ICC for failing to pay this additional interest, and took the position that he never agreed to or executed the Reserve Agreement, even though he admits that he withheld $1,260,000 from the amount of the March Note, his conduct constitutes a prior material default under the Notes. According to defendants, "Ginsburg either improperly withheld $1,260,000 that was supposed to be paid to ICC or improperly demanded payment of interest that had already been paid and sued ICC for interest that was not owed. Therefore, Ginsburg's prior breach bars his recovery for breach of contract." Ds. Br. 14.

Ginsburg responds that he has plausibly alleged all of the elements of a claim for breach of contract; that the fourth amended complaint pleads that the Reserve Agreement represents no more than preliminary negotiations, that Ginsburg never executed the Reserve

- 22 -

Agreement or consented to its terms, and that, accordingly, the unsigned Reserve Agreement is unenforceable against Ginsburg and does not excuse ICC from its obligation to make the interest payments required under the Notes; that defendants' prior material breach affirmative defense is not established based on the face of the complaint and the unambiguous terms of the March Note, which contains no promise by Ginsburg to transfer the full $3.6 million, but instead specifies that a lesser amount may be loaned; and that ICC's failure to pay the accrued interest qualifies as a default under the Notes, and Ginsburg's demand that ICC pay what is owed under the Notes is not a prior material breach.

## B

Under Illinois law,[12] to prove a claim for breach of contract, a plaintiff must establish the following elements: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Catania v. Local 4250/5050 of Commc'ns Workers of Am.*, 834 N.E.2d 966, 971 (Ill. Ct. App. 2005) (citation omitted). In the fourth amended complaint, Ginsburg alleges that, on March 16, 2016, he executed a promissory note in the amount of $3.6 million, and, pursuant to the Note, transferred $2,340,000 to ICC. Ginsburg also asserts that the Notes required ICC to pay accrued interest three months after each Note's effective date; that ICC defaulted by failing to make the interest payments required by the Notes; that he sent

_____

[12]Defendants cite Texas law to support this ground of their motion to dismiss. As the court has explained above, however, *see supra* § III(B), the Notes are governed by Illinois law. The court therefore relies on Illinois law in deciding whether Ginsburg has plausibly alleged a contract claim based on defendants' alleged breach of the Notes.

a demand letter on July 6, 2016, demanding that the interest be paid to him by August 4, 2016; that he sent a demand letter on April 26, 2017 stating that the interest then owing under the Notes exceeded $1,260,000; and that, because ICC did not pay the interest owed, the Notes were accelerated, such that all principal and interest owed on the Notes are now due and payable.  These allegations are sufficient to plausibly allege the elements of a breach of contract claim under Illinois law.

Defendants contend that, under the Reserve Agreement, Ginsburg was to withhold $1,260,000 to service 12 months of interest payments under both Notes, and that, accordingly, ICC did not breach the Note.  Ginsburg alleges, however, that he never agreed to, or signed, the Reserve Agreement.  He asserts that

> [t]he Reserve Agreement represents no more than preliminary negotiations between the Parties.  Ginsburg never executed the Reserve Agreement, nor did he ever consent to its terms, explicitly or implicitly.  In fact, Ginsburg provided the March 2016 funds to ICC without ever having seen the Reserve Agreement. . . .  Furthermore, the Reserve Agreement was executed solely by McGraw, and was executed not on behalf of ICC but rather in his capacity as CEO for an entity referenced as "Revolution Enterprises."  ICC is not referenced anywhere in the Reserve Agreement, and the Note to which the Reserve Agreement purportedly applied was dated March 3, 2016—although the Promissory Note between ICC and Plaintiff was, in fact, dated March 16, 2016.

4th Am. Compl. ¶ 17 (citation omitted).  Because, at the motion to dismiss stage, the court must accept all well-pleaded facts as true and draw all reasonable inferences in Ginsburg's favor, the court cannot dismiss Ginsburg's breach of contract claim on the basis of a Reserve Agreement that Ginsburg alleges he never agreed to or signed.

Nor can the court dismiss Ginsburg's claim on the theory that his withholding $1,260,000 constituted a prior material breach of the Notes that now bars him from recovering. It is true that, under Illinois law, "the rule is well-settled that a party cannot sue for breach of contract without alleging and proving that he himself substantially complied with all the material terms of the agreement." *George F. Mueller & Sons, Inc. v. N. Ill. Gas Co.*, 336 N.E.2d 185, 189 (Ill. Ct. App. 1975). The court cannot conclude, however, based on the allegations in the fourth amended complaint, that Ginsburg did not substantially comply with the material terms of the Notes. At the very least, defendants do not contend that Ginsburg failed to substantially comply with all of the material terms of the January Note. Accordingly, Ginsburg has at least pleaded a plausible claim based on ICC's breach of the January Note. And because the fourth amended complaint does not resolve the question whether Ginsburg materially breached the March Note, the court concludes that this issue must be resolved on summary judgment motion or at trial.

Accordingly, the court denies defendants' motion under Rule 12(b)(6) to dismiss Ginsburg's breach of contract claim.

## V

The court next considers Ginsburg's fraud claims, beginning with his claim for common law fraud.

## A

In ¶ 20 of the fourth amended complaint, Ginsburg alleges a claim for common law

fraud.  Under Texas law,[13] the elements of a claim for common law fraud are:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Choe v. Bank of Am., N.A.*, 2013 WL 3196571, at *5 (N.D. Tex. June 25, 2013) (Fitzwater, C.J.) (quoting *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004) (citations omitted) (Texas law)), *aff'd*, 605 Fed. Appx. 316 (5th Cir. 2015).  Defendants move to dismiss Ginsburg's common law fraud claim on the basis that he has failed to meet the particularity requirement of Rule 9(b), has pleaded representations of future estimates or projections, not past or existing facts, and has not plausibly alleged that defendants knew that any representation was false or reckless at the time it was made.

Ginsburg responds that the misrepresentations on which he bases his fraud claims are set forth in ¶ 12 of the fourth amended complaint; that an expression of an opinion as to the occurrence of a future event may constitute fraud if the speaker purports to have special knowledge of facts that will occur or exist in the future, or if the opinion or prediction is based on or buttressed with false facts; that defendants' material misrepresentations regarding

---

[13]In their motion to dismiss Ginsburg's common law fraud claim, defendants cite only Texas law.  Although in responding, Ginsburg cites both Illinois and Texas law, he does not contend that the law of the two states differs with respect to his claims for common law fraud.  Accordingly, because neither side has engaged in a full choice-of-law analysis, and because the parties appear to agree that either Texas law applies, or that, if Illinois law applies, the result would be the same as it would be under Texas law, the court will apply Texas law for purposes of deciding defendants' motion to dismiss Ginsburg's common law fraud claim.

the financial status, performance, and viability of ICC are actionable because they were based on, or buttressed with, false facts (or, at a minimum, lacked any reasonable factual basis when made); that the massive discrepancy in defendants' financial predictions before they received funds from Ginsburg and after they received funds demonstrates that the projections were either false when made or that McGraw had no reasonable basis to believe that his statements were true when he made them; that defendants' misrepresentations were based on their having one-sided knowledge of the facts underlying those statements; that McGraw had exclusive access to ICC's financial dealings and records and thus had superior knowledge of ICC's status and operations; that McGraw represented that he had "superior knowledge" regarding the status of medical cannabis legislation and ICC's role in those efforts; and that Ginsburg was not in a position to access or evaluate the same information to which defendants had access and to make his own interpretation thereof.

## B

Defendants contend that Ginsburg has not pleaded that they made any prediction or representation known to be false when it was made. As a general matter, "[p]ure expressions of opinion are not representations of material fact, and thus cannot provide a basis for a fraud claim." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011). Moreover, "[b]ecause a prediction, or statement about the future, is essentially an expression of opinion, future predictions are generally not actionable." *Hoffman v. L&M Arts*, 838 F.3d 568, 579 (5th Cir. 2016) (brackets, citation, and internal quotation marks omitted). Accordingly, "[t]he generally accepted rule in Texas jurisprudence is that future

predictions and opinions, especially those regarding the future profitability of a business, cannot form a basis for fraud as a matter of law." *Zar v. Omni Indus., Inc.*, 813 F.2d 689, 693 (5th Cir. 1987) (citations omitted); *see also Guevara v. Lackner*, 447 S.W.3d 566, 577 (Tex. App. 2014, no pet.) ("Predictions and opinions regarding the future profitability of a business generally cannot form a basis for a claim of fraud."); *Fry v. Farm & Ranch Healthcare, Inc.*, 2007 WL 4355055, at *3 (Tex. App. Dec. 13, 2007, no pet.) (mem. op.) ("Predictions and opinions regarding the future profitability of a business generally cannot form a basis for a claim of fraud."); *Lloyd v. Junkin*, 75 S.W.2d 712, 714 (Tex. Civ. App. 1934, no writ) (holding that because "that which lies in the future cannot be a matter of certain knowledge," representations as to future value, productiveness, efficiency, or expected earnings or profits "must be taken and understood as mere expressions of opinion, and therefore their nonfulfillment cannot be treated as fraud"); *Nat'l Newspaper Enters. v. Chitwood*, 68 S.W.2d 264, 267 (Tex. Civ. App. 1934, writ dism'd) ("We do not question the proposition of law that a statement of the belief of the future earnings of a business, necessarily based more or less upon guesswork, cannot be made the basis for a charge of fraud, or for awarding damages.").

There are two recognized exceptions, however, to this general rule. First, "[a]n opinion may constitute fraud if the speaker has knowledge of its falsity." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). Second, "[a]n expression of an opinion as to the happening of a future event may also constitute fraud where the speaker purports to have special knowledge of facts that will occur or exist in the future." *Id* (citations omitted); *see*

*also Italian Cowboy Partners*, 341 S.W.3d at 338 ("Special or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion.").

C

Ginsburg limits his fraud claims to the alleged misrepresentations pleaded in ¶ 12 of the fourth amended complaint. In ¶ 12(a), Ginsburg alleges that "[p]er the PPM, provided by McGraw to Plaintiff on January 6, 2016, ICC stated (on p. 13) that estimated annual revenue for medical cannabis sales in Illinois in that time period would be $1,115,910,000; and projected (on p. 28) that the Company would have EBITDA in 2016 of $46,817,840, and more in 2017." 4th Am. Compl. ¶ 12(a). He alleges in ¶ 12(f) that, on February 17, 2016, ICC's CFO[14] emailed him three-year forecasted financials projecting EBITDA of negative $1,452,781.00 for 2016 (negative 410,850 for Q1, negative $299,559.00 for Q2; negative $298,281.00 for Q3; and negative $444,091.00 for Q4); EBITDA of $3,052,688.00 in 2017 (with a positive net cash flow of $52,688.00); and EBITDA of $21,104,488.00 in 2018 (with a positive cash flow of $19,104,488.00). Ginsburg contends that these "statements and projections had no basis in fact and were, stated mildy, wildly optimistic forecasts," *id*. ¶ 12(j), alleging that in a May 16, 2016 email, McGraw provided five-year projected financials showing actual Q1 EBITDA of negative $1,932,113.00 and revised 2016 EBITDA of negative $4,885,755.00. In his response brief, Ginsburg argues that the "massive discrepancy" over a four-month period between the Company's projected EBITDA *before*

---

[14]The court assumes *arguendo* that defendants can be held liable for the fraudulent misstatements made by Charak, ICC's CFO.

defendants received additional funds from Ginsburg, and the revised EBITDA *after* defendants received the desired funds "demonstrates that the projections were either false when made or that McGraw had no reasonable basis to believe that his statements were true when he made them." P. Br. 12. The court disagrees.

To the extent Ginsburg bases his common law fraud claim on ICC's statement in the PPM that $1,115,910,000 was a "reasonable estimate of the projected revenue for medical cannabis sales in Illinois,"[15] Ds. App. 14, the court grants defendants' motion to dismiss this claim. The PPM states that $1,115,910,000 is a "reasonable *estimate*," *id.* (emphasis added), using a conservative national average of 7.7 patients per 1000 residents in states where medical cannabis is legal. This projected figure is clearly an opinion predicting a possible future outcome based on fully disclosed data (the national average multiplied by Illinois' total population according to the 2013 census) that cannot, as a matter of law, constitute a material misrepresentation of fact for purposes of Ginsburg's fraud claim. *See Zar,* 813 F.2d at 693; *Fry*, 2007 WL 4355055, at *3. Moreover, although Ginsburg argues in his response that McGraw represented that he had superior knowledge regarding the status of medical cannabis legalization and ICC's role in those efforts, Ginsburg does not plead that ICC or McGraw had special knowledge with respect to the projected revenue for medical cannabis sales in Illinois. Nor does he plead that either ICC or McGraw knew that a projection of

_____

[15]In deciding defendants' motion to dismiss, the court is permitted to consider this evidence, which is referenced in the complaint. *See Lone Star Fund V (U.S.)*, 594 F.3d at 387.

$1,115,910,000 in revenue was false.[16]

Similarly, the financial projections contained in the PPM (which the PPM itself identifies as "forward looking statements") and Charak's February 17, 2016 email, are predictions regarding ICC's future profitability, and, as such, do not constitute material misstatements of fact.[17] *See Zar*, 813 F.2d at 693; *Fry*, 2007 WL 4355055, at *3. Ginsburg neither pleads nor argues that, at the time the PPM or the February 17, 2016 email was drafted, ICC or McGraw knew that the financial projections contained therein were false. He argues in his brief that the financial projections are actionable because "they were based on or buttressed with false facts," P. Br. 11, but he does not point to any particular facts on which the financial projections in the PPM or the February 17, 2016 email were based or "buttressed" that he contends were false. McGraw alleges only that there was a discrepancy between projected EBITDA in January and February and actual EBITDA (and revised EBITDA for the future) at the quarter's end. This discrepancy is alone insufficient to

---

[16]Although Ginsburg alleges that "[p]er the PPM . . . ICC stated (on p. 13) that estimated annual revenue for medical cannabis sales in Illinois *in that time period* would be $1,115,910,000," 4th Am. Compl. ¶ 12(a) (emphasis added), the PPM does not itself state any time frame for its estimate. Accordingly, even if Illinois does not currently have a total wholesale revenue of $1,115,910,000 for medical cannabis sales, it is still possible that, at some point in the future, its annual revenue for medical cannabis sales will reach $1,115,910,000. Accordingly, Ginsburg's fraud claim based on this statement in the PPM fails for the additional reason that Ginsburg cannot show that ICC's prediction was false.

[17]Because the court concludes that the financial projections in the PPM are predictions about the future and that Ginsburg has not pleaded that these predictions fall within either of the two exceptions to the general rule, the court does not address defendants' argument that the cautionary statements in the PPM render these projections immaterial as a matter of law and prevent Ginsburg from plausibly alleging reliance.

plausibly allege that defendants knew, at the time they drafted the PPM and the February 17, 2016 email, that the financial projections therein were false or lacked any reasonable factual basis. And although Ginsburg argues in his brief that "McGraw had exclusive access to ICC's financial dealings and records and thus had superior knowledge of the Company's status and operations," *id.* at 12, he has not alleged in his fourth amended complaint that ICC or McGraw had special or one-sided knowledge of any past facts that would impact the accuracy of the financial projections in the PPM. *Cf. Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 339 ("Even assuming, however, that Powell's statements are properly considered pure expressions of opinion, Prudential's one-sided knowledge of past facts makes these particular representations actionable under the circumstances.").

D

The court concludes that the following statements (assuming *arguendo* that they are not subject to dismissal on the basis that they are vague statements of corporate optimism or "puffery,"[18]) are also predictive statements that cannot support a viable common law fraud claim: McGraw's statement in a February 4, 2016 email that the "'Holland deal' will 'make Revolution the largest producer on the planet,'" 4th Am. Compl. ¶ 12(d); his statements, in a February 17, 2016 email to Ginsburg, that being ICC's lead investor is "lucrative," that

---

[18]*See, e.g., Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (describing as "non-actionable puffery" statements that "are 'of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation.'" (quoting *Lain v. Evans*, 123 F.Supp.2d 344, 348 (N.D. Tex. 2000) (Sanders, J.))).

McGraw had structured the deals "so [Ginsburg will] get [his] capital back quickly," that "[w]e will overnight be bigger than GW," that "the future is [expletive] bright," and that ICC "stands alone at the top of cannabis," *id.* ¶ 12(e) (some alterations in original); and his statement, in a March 3, 2016 email to Ginsburg, that "[t]here is HUGE demand for [marijuana extract] and we can make a [expletive] load as soon as we get the final inspection of the labs done.  Which if we pay today or tomorrow can be next week.  We want more revenue but we are sitting on a pile of money because the labs aren't online," *id.* ¶ 12(h). Ginsburg does not specifically address any of these statements in his brief, and there is no suggestion in the fourth amended complaint that McGraw had special knowledge regarding these statements or that he knew they were false when he made them.  Accordingly, the court dismisses Ginsburg's fraud claim based on these predictions of ICC's future success.

E

Ginsburg's remaining allegations in support of his fraud claim fail because he has not pleaded that ICC or McGraw made the alleged misstatements with knowledge that they were false or without knowledge of their truth.  The fourth amended complaint alleges that, in early January 2016, McGraw assured Ginsburg that ICC's bank required audited financial statements and that he would provide copies to Ginsburg as they were prepared, but later, when McGraw requested detailed month-end and quarter-end financial statements, McGraw responded in a June 2016 email that Ginsburg was not entitled to have access to quarterly, monthly, or detailed financial statements, and that defendants "do not have audited financials if that's what you need."  4th Am. Compl. ¶ 12(b).  Ginsburg does not allege that, when

McGraw represented that ICC's bank required audited financial statements and that he would provide Ginsburg copies, McGraw either knew this statement was false or made this statement without knowledge of its truth. Ginsburg also asserts that McGraw stated in a February 4, 2016 email "[t]he Holland deal is ours now. Revolution [an operating arm of ICC] will take operating control. . . . Moral of the story is we are in the driver[']s seat." *Id.* ¶ 12(d). Assuming *arguendo* that McGraw's statement is a representation of existing facts (as opposed to a prediction about a future event), Ginsburg does not allege that, when McGraw made this statement, he knew that the Holland had not been (or would not be) finalized, or that he made this statement without knowledge of its truth.

F

In sum, with respect to each alleged misstatement that Ginsburg pleads in support of his fraud claim,[19] he has either failed to plead a material representation—he has pleaded only a prediction of future events, or an inactionable opinion—or he has failed to plead that defendants made the alleged misstatements with knowledge that the statements were false or without knowledge of their truth. Accordingly, the court grants defendants' motion to

---

[19]Although Ginsburg alleges in ¶ 13 of the fourth amended complaint that defendants also materially misrepresented having specialized knowledge about the status of marijuana legalization efforts nationally and internationally, in general, and about the status of the Illinois legislature's position and timetable for getting laws changed, which would expand the potential Illinois customer base for medical marijuana usage, in particular, he has limited his fraud claims to the allegations contained in ¶ 12 of the fourth amended complaint. Accordingly, the court does not consider whether any of the allegations in ¶ 13 plausibly allege an actionable misrepresentation.

dismiss Ginsburg's common law fraud claim.[20]

VI

The court next considers Ginsburg's claims brought under the Exchange Act. In ¶ 22 of the fourth amended complaint, Ginsburg alleges a claim for fraud in connection with the purchase or sale of securities, in violation of § 10(b) the Exchange Act and Rule 10b-5. In ¶ 23, Ginsburg alleges that McGraw is liable under § 20 of the Exchange Act, 15 U.S.C. § 78t, as a person who controls ICC.

A

Section 10(b) and Rule 10b-5 "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 681 (5th Cir. 2015)(quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, ___U.S. ___, 134 S.Ct. 2398, 2408 (2014)). To recover under § 10(b) and Rule 10b-5, plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co.*, 134 S.Ct. at 2407 (citations and internal quotation marks omitted). Claims under § 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15

---

[20]Because the court is dismissing Ginsburg's common law fraud claim based on the pleading defects identified, it does not address defendants' arguments under Rule 9(b), or the arguments based on reliance (to the extent defendants intended these grounds for dismissal to apply to Ginsburg's common law fraud claim).

U.S.C. § 78u-4(b). *Milano v. Perot Sys. Corp.*, 2006 WL 929325, at *3 (N.D. Tex. Mar. 31, 2006) (Fitzwater, J.) (citing *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005)).[21]

Defendants move to dismiss Ginsburg's Exchange Act claims, contending for the following reasons that he has failed to meet the stringent pleading requirements of Rule 9(b) and the PSLRA for his federal and state securities law claims: Ginsburg has failed to plead, with the rigorous level of particularity required by Rule 9(b) and the PSLRA, that defendants acted with the required scienter to violate the federal securities laws; the fourth amended complaint does not allege any facts to support a strong inference that any defendant knew that a statement was false when made, or acted with severely reckless disregard about the veracity of any statement, because Ginsburg has identified only a series of optimistic projections about ICC's future that ultimately failed to come true; Ginsburg has failed to identify, with the particularity required by the PSLRA, any statement alleged to be misleading and the reasons why the statement is misleading; Ginsburg has failed to identify any actionable material misrepresentation because each of the misrepresentations on which he bases his claims is merely an estimate or predictive statement relating to ICC's future

_____

[21]The PSLRA provides that a complaint that alleges a material misstatement or omission under § 10(b) and Rule 10b-5 must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). It also provides that "in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 74u-4(b)(2)(A).

performance; Ginsburg alleges no particularized facts to support that the projections or predictive statements were false when made, defendants did not believe the statements to be true when made, the projections or predictive statements lacked any reasonable basis, or defendants knew of undisclosed facts that would seriously undermine the accuracy of the statements; and the PPM disclaims reliance, discloses all material risks and that material may be omitted, expressly states that the projections are "forward-looking," and admonishes potential investors to perform their own investigation and due diligence.

Ginsburg responds by arguing, *inter alia*, that his allegations demonstrate that defendants "(1) did not genuinely believe that their statements to Plaintiff were true; (2) had no reasonable basis to believe that their statements were true; and (3) possessed superior knowledge of the Company's financial operations and overall viability, and thus were aware of facts undermining their statements and projections." P. Br. 13. He also contends that he has not merely alleged that ICC's projected profits were not realized; instead, he asserts that defendants never intended to realize the projected profits and knew their financial projections were completely unrealistic. Regarding scienter, Ginsburg contends that defendants' "misstatements and omissions were made in the context of discussions wherein Defendants were seeking millions of dollars from Plaintiff to provide funding for ICC by means of convertible promissory notes," and the "inference that Defendants' misstatements were made with scienter is at least as strong as any other inference that could be made from the facts stated in the Complaint." P. Br. 19.

## B

Largely for the reasons explained above, *see supra* § V(C), the court holds that, to the extent Ginsburg bases his Exchange Act claims on statements reflecting defendants' personal opinions, beliefs about the future, or projections of future performance—including, *inter alia*, ICC's financial projections and predictions about its expected profits and the status of the market—Ginsburg has failed to plead an actionable misstatement of fact.[22]

"[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993). Nonetheless, while predictive statements are typically not actionable, "a defendant does not place itself beyond the reach of the securities laws merely by disclosing information that is predictive in nature. . . . [W]hether liability is imposed depends on whether the predictive statement was 'false' when it was made." *Isquith v. Middle S. Utils. Inc.*, 847 F.2d 186, 203 (5th Cir. 1988); *see also In re BP p.l.c. Sec. Litig.*, 852 F.Supp.2d 767, 790 (S.D. Tex. 2012) ("Statements that are predictive in nature are actionable only if they were false when made." (citing *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993)); *In re Franklin Bank Corp. Sec. Litig.*, 782 F.Supp.2d 364, 386 (S.D. Tex. 2011) ("Projections of future performance generally are not actionable under the securities laws, unless they were false when made."). "A statement of belief is a factual misstatement

---

[22]Because defendants do not raise the argument, the court does not consider whether any of defendants' alleged misrepresentations constitute forward-looking statements that fall within the PSLRA's safe harbor provision. *See* 15 U.S.C. § 78u-5.

actionable under Section 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 691, n.24 (5th Cir. 2014) (quoting *Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014)); *see also Rubinstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994) ("[A] predictive statement is one that contains at least three factual assertions that may be actionable: 1) The speaker genuinely believes the statement is accurate; 2) there is a reasonable basis for that belief; and 3) the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement.").

Setting aside the conclusory allegation in the fourth amended complaint that defendants' "statements and projections had no basis in fact and were, stated mildly, wildly optimistic forecasts," 4th Am. Compl. ¶ 12(j), Ginsburg has not plausibly alleged that any of the projections or predictive statements was false when made; that defendants did not actually believe the statements to be true when made; that the projections or predictive statements lacked any reasonable basis; or that defendants knew of undisclosed facts that would seriously undermine the accuracy of the statements. Accordingly, the court concludes that Ginsburg's Exchange Act claims based on defendants' opinions, projections, or predictive statements must be dismissed.

## C

Moreover, Ginsburg's Exchange Act claims must be dismissed for the additional reason that Ginsburg has failed to plead specific facts establishing a strong inference of

scienter.

1

Scienter is a required element of any securities fraud action. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001). Scienter consists of "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC*, 401 F.3d at 643 (citation omitted). "[P]laintiffs may establish scienter by demonstrating either intent or severe recklessness." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (emphasis omitted); *see Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("[T]he . . . state of mind requirement is severe recklessness or actual knowledge.").

The standards for pleading scienter are governed by the PSLRA. "The PSLRA pleading standard for scienter is especially challenging for plaintiffs." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). "[T]o survive a motion to dismiss a securities-fraud action, plaintiffs must, *inter alia*, plead specific facts establishing a strong inference of scienter." *Fin. Acquisition Partners*, 440 F.3d at 287 (citing *Nathenson*, 267 F.3d at 407). "To qualify as 'strong' within the intendment of § 21D(b)(2) . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). To allege scienter based on defendant's conscious conduct, "a plaintiff must plead strong circumstantial evidence of misbehavior." *Mortensen*

*v. AmeriCredit Corp.*, 123 F.Supp.2d 1018, 1025 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd*, 240 F.3d 1073 (5th Cir. 2000). To plead scienter based on recklessness, a plaintiff must demonstrate "an extreme departure from the standard of ordinary care . . . that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015) (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)).

In deciding defendants' motion to dismiss, the court "accept[s] the facts alleged in the plaintiffs' complaint as true and constru[es] their allegations in the light most favorable to them." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 244 (5th Cir. 2003) (citing *Abrams*, 292 F.3d at 430). The court does not, however, "'strain to find inferences favorable to the plaintiff[ ].'" *Id.* (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)). "Nor [does the court] accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp.*, 365 F.3d at 361 (citing *Nathenson*, 267 F.3d at 406).

2

Even when construed in the light most favorable to Ginsburg, the fourth amended complaint does little more than allege that defendants made "wildly optimistic forecasts," 4th Am. Compl. ¶ 12(j), and did not accurately predict what their financial results (or the market for medical marijuana in Illinois) would be. "[C]ompany officials should not," however, "be held responsible for failure to foresee future events." *Abrams*, 292 F.3d at 433 (approving Second Circuit's observation in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)). No

allegation in the fourth amended complaint supports an inference, much less a "strong inference," that defendants knew or should have known that there was no basis for predicting the forecasted financials included in the PPM or Charak's February 17, 2016 email, that ICC would be highly profitable, that Ginsburg would get his capital back "quickly," that ICC would finalize the "Holland deal," that Revolution would be the largest producer of medical marijuana, or that production would start as soon as final inspection of the labs was completed. As currently pleaded, this is a classic case of alleging "fraud by hindsight," which is insufficient to plead a plausible claim. *See, e.g., Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (defining "fraud by hindsight" as the case where "a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly," or where "there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867-68 (5th Cir. 2003) (affirming dismissal of securities fraud class action where certain factual underpinnings on which plaintiffs relied were hindsight assessments of defendants' performance); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp.3d 813, 827 (S.D. Tex. 2014) ("In hindsight, the forecasts that defendants made on February 26, 2013, thus turned out to be incorrect; but incorrectness alone does not mean that the February 26, [2013], forecasts are actionable."). As defendants argue in their reply,

> the facts in the [fourth amended complaint] present the equally (if not more) plausible scenario of a startup company in a cutting-edge industry, illegal under federal law, subject to state laws and policies constantly in flux, and therefore operating under strong forces beyond the control of the company and its

> principals.  It is hardly surprising under these circumstances that
> the company's forward-looking projections of revenue and
> EBITDA change significantly from month to month, and those
> changes themselves or the failure to predict them, do not support
> a conclusion of "severely reckless" or "highly unreasonable"
> behavior.

Ds. Reply 9.  Business misjudgments alone are not fraud.  *See Melder v. Morris*, 27 F.3d 1097, 1101 n.8 (5th Cir. 1994).[23]

Accordingly, because Ginsburg has failed to satisfy the PSLRA pleading requirement of a strong inference of scienter, the court concludes that Ginsburg has failed to plausibly allege his claims under the Exchange Act, and it grants defendants' motion to dismiss these claims.

D

Ginsburg seeks to hold McGraw liable under § 20 of the Exchange Act, 15 U.S.C. § 78t, as a person who controls ICC.  Because Ginsburg has not plausibly alleged a § 10(b) or Rule 10b-5 violation, his control person claim against McGraw fails as well.  *See Southland Sec. Corp.*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation." (citing *Lovelace v. Software Spectrum Inc*., 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)).  Accordingly, the court grants defendants' motion to dismiss Ginsburg's claim brought under § 20 of the Exchange Act.

---

[23]Regarding the two allegations that allege a misstatement of *existing* facts (i.e., McGraw's statement that ICC's bank required audited financial statements and that "the Holland deal is ours"), Ginsburg does not plausibly allege—either through direct or circumstantial allegations—that McGraw made either of these statements with an intent to deceive, manipulate, or defraud, or that he made them with severe recklessness.

Ginsburg sues both defendants under the Texas Securities Act ("TSA"), Tex. Rev. Civ. Stat. Ann. Art. 581-33(A)(2), and brings a claim against McGraw under Tex. Rev. Civ. Stat. Ann. Art. 581-33(F) as a person who controls ICC. Defendants move to dismiss these claims, contending that Ginsburg has failed to plead that defendants made any prediction or representation known to be false when it was made.[24]

A

Article 581-33 of the TSA provides, in pertinent part:

> A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

Tex. Rev. Civ. Stat. Ann. Art. 581-33(A)(2). Article 581-33(A) differs in significant respects from § 10(b) and from common law fraud in that it does not require reliance by the purchaser

---

[24]In their reply brief, defendants contend that, because the Notes contain an Illinois choice of law provision, Ginsburg cannot bring Texas law claims, and his claims under the TSA and the Texas Business and Commerce Code should be dismissed. As noted above, *see supra* note 8, the court will not consider arguments raised for the first time in a reply brief. *Jacobs*, 2006 WL 2728827, at *7. Accordingly, the court does not address defendants' contention that Ginsburg is barred from bringing these Texas claims.

on the seller's material misrepresentation or omission. *Granader v. McBee*, 23 F.3d 120, 123 (5th Cir. 1994); *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 649 (Tex. App. 1995, writ dism'd w.o.j.) ("An omission or misrepresentation is material if there is a substantial likelihood that a *reasonable* investor would consider it important in deciding to invest. An investor is not required to prove that he would have acted differently but for the omission or misrepresentation. . . . [T]he focus under the Texas Securities Act is on the conduct of the seller or issuer of securities, i.e., whether they made a material misrepresentation, not on the conduct of individual buyers."). Nor does the plaintiff have to demonstrate scienter under the TSA (although courts have held that intent or scienter is an element of a claim under Art. 581-33 for an untrue promise of future performance). *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 33-44 (5th Cir. 2008).

B

As with the common law fraud and Exchange Act claims discussed above, "statements of opinion, including opinions about a security's value, are generally not actionable under [the TSA]." *Murphy v. Reynolds*, 2011 WL 4502523, at \*8 (Tex. App. Sept. 29, 2011, no pet.) (mem. op.); *see also Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App. 2001, pet. denied) (noting that predictions of increased share prices generally do not amount to actionable misrepresentations); *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218-19 (Tex. App. 1999, pet. denied) (holding that characterization of investment as "low risk" and prediction of "large revenues for a long time" were statements of opinion that were not actionable under fraud provision of TSA where investors had equal access to information on

which opinions were based).  Moreover, "[b]ecause the [TSA] is so similar to the federal [Exchange Act], Texas courts look to decisions of the federal courts to aid in the interpretation of the [TSA]." *Grotjohn Precise Connexiones Int'l, S.A. v. JEM Fin., Inc.*, 12 S.W.3d 859, 868 (Tex. App. 2000, no pet.).

To the extent Ginsburg bases his TSA claims on statements reflecting defendants' personal opinions, beliefs about the future, or projections of future performance, the court concludes, for the reasons explained above, *see supra* §§ V(C) - (E) and VI(B), that Ginsburg has failed to plausibly plead that defendants made an "untrue statement of material fact," as required by the TSA.  With respect, however, to defendants' alleged misrepresentations of *existing* facts—for example, McGraw's verbal assurances that ICC's bank required audited financial statements and his statement that "[t]he Holland deal is ours now," 4th Am. Compl. ¶ 12(d) (alteration in original) (to the extent this statement expresses the existing fact that the "Holland deal" is complete, as opposed to predicting that the "Holland deal" will be finalized)—because scienter is not a required element of Ginsburg's TSA claims, and because defendants do not move to dismiss these claims on any other ground, the court denies defendants' motion to dismiss Ginsburg's TSA claim based on these allegations.

VIII

Ginsburg brings a claim for statutory fraud under Texas law, alleging that defendants violated Tex. Bus. & Com. Code. Ann. § 27.01.

A

Defendants move to dismiss this claim, contending that § 27.01 does not apply as a

matter of law because Ginsburg has not pleaded that there has been an actual conveyance of stock (the Notes only gave Ginsburg the option to convert any outstanding principal owed under the Notes into Class B units). They also maintain that the plain language of § 27.01 requires a false representation of a past or existing fact or a false promise, does not give rise to a cause of action for fraud by omission, and that, to the extent Ginsburg's claim for statutory fraud is based on alleged omissions, it should be dismissed.

Ginsburg responds that contracts to convey stock—like the Notes in the present case—qualify as "transactions" under § 27.01, and that the contrary authority on which defendants rely is outdated or inapplicable; that defendants' argument that § 27.01 does not support a cause of action for fraud by omission is equally flawed; and that the fourth amended complaint specifies that Ginsburg's claim for statutory fraud is based on defendants' false representations designed to induce him to execute the convertible Notes, and because defendants undoubtedly knew of the falsity of their representations and failed to disclose that falsity in order to reap the benefits of Ginsburg's funding, the statute is satisfied and defendants are potentially liable for exemplary damages under § 27.01(d).

B

To establish a statutory fraud claim, a plaintiff must prove: (1) a transaction involving real estate or stock; (2) during the transaction, the other party made a false representation of fact, made a false promise, or benefited by not disclosing that a third party's representation was false; (3) the false representation or promise was made for the purpose of inducing the party to enter into a contract; (4) the party relied on the false representation or promise by

entering into the contract; and (5) the reliance caused the party injury. Tex. Bus. & Com. Code Ann. § 27.01. Thus a viable claim for statutory fraud must relate to "a transaction involving real estate or stock in a corporation." *Id.*

> Courts have "strictly" interpreted [the "transaction involving real estate or stock"] requirement, holding that for fraud in a transaction to be actionable under section 27.01, the contract must "actually effect the conveyance" of real estate or stock between the parties, and it "cannot merely be tangentially related or a means for facilitating a conveyance" of real estate or stock.

*Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 823 (Tex. App. 2015, no pet.) (quoting *Evans v. Wilkins*, 2001 WL 1340356, at *3 (Tex. App. 2001, no pet.) (not designated for publication)); *see also U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000) ("Section 27.01(a) also applies only to situations where there is an actual conveyance of the stock, and not to situations where there is merely a breach of contract to convey stock." (citing *Stanfield v. O'Boyle*, 462 S.W.2d 270, 271 (Tex. 1971)); *Tex. Commerce Bank Reagan v. Lebco Constructors, Inc.*, 865 S.W.2d 68, 82 (Tex. App. 1993, writ denied) ("Texas courts have not interpreted section 27.01 that broadly."). "In o[th]er words, the contract must cause stock to be conveyed." *Ginn*, 472 S.W.3d at 823 (citing cases). "A transaction occurs when there is a sale or a contract to sell real estate or stock between the parties." *Id.* (citing *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App. 2000, pet. denied); *Nolan v. Bettis*, 577 S.W.2d 551, 556 (Tex. Civ. App. 1979, writ ref'd n.r.e.)).

Ginsburg neither alleges nor argues in his brief that defendants actually conveyed any ICC stock. He instead maintains that the cases defendants cite in support of their argument

are "outdated" because they pre-date the 1983 amendments to the statute.  P. Br. 17.

Ginsburg contends that

> [t]he Texas Supreme Court's opinion in *Stanfield* and the Fifth
> Circuit's opinion in *U.S. Quest*. . . was based on language in
> Article 4004 which provided that damages for fraud were to be
> measured by the difference between the value of the property as
> represented and the actual value of the property as it was
> delivered.  Such language was removed from the statute when
> Section 27.01 was amended in 1983.  Thus *Stanfield* and the
> cases interpreting it no longer control, and contracts to convey
> stock—such as the ones in the present case—qualify as
> "transactions" under Section 27.01.  *See Tukua Invs.*[*, LLC v.
> Spenst*, 413 S.W.3d 786, 796 (Tex. App. 2013, pet. denied)].

P. Br. 17 (some citations omitted).  Ginsburg cites to no binding authority, however, in

support of this position.  Numerous cases, including the Fifth Circuit's decision in *U.S.

Quest*, post-date the 1983 amendments to § 27.01 and hold that an actual conveyance of stock

must occur in order for there to be an actionable claim under the statute.  *See, e.g., U.S.

Quest*, 228 F.3d at 406 ("Section 27.01(a) also applies only to situations where there is an

actual conveyance of the stock, and not to situations where there is merely a breach of

contract to convey stock."); *Zhang v. Monroe*, 2017 WL 108311, at *8 (E.D. Tex. Jan. 11,

2017) (same); *Ginn*, 472 S.W.3d at 823 ("Courts have 'strictly' interpreted this requirement,

holding that for fraud in a transaction to be actionable under section 27.01, the contract must

'actually effect the conveyance' of real estate or stock between the parties, and it 'cannot

merely be tangentially related or a means for facilitating a conveyance' of real estate or

stock." (citations omitted)).

In the single case on which Ginsburg relies, *Tukua Investments, LLC v. Spenst*, 413

S.W.3d 786, 796 (Tex. App. 2013, pet. denied), a Texas court of appeals held that a contract to convey real estate constitutes a "transaction" under § 27.01 even if an actual conveyance of real estate does not occur. But even assuming *arguendo* that it is sufficient for purposes of a claim under § 27.01 to allege a contract to convey stock (rather than an actual conveyance of stock), Ginsburg has not pleaded, as he argues in his brief, that the Notes in this case are "contracts to convey stock." P. Br. 17. In the fourth amended complaint, Ginsburg alleges that he "loaned ICC $7,000,000 as evidenced by a Promissory Note in that same amount, convertible into Class B Units in the Company," 4th Am. Compl. ¶ 12(c), and that he "executed a Promissory Note in the stated amount of $3,600,000 . . . which Note is convertible into Class B Units in the Company," *id.* ¶ 12(i). The convertible Notes in this case are analogous to the unvested stock options courts have held to be insufficient to support a claim under § 27.01. *See, e.g., Ginn*, 472 S.W.3d at 823 ("when an agreement only grants unvested stock, it does not constitute a transfer or conveyance of stock that implicates section 27.01."); *Stephanz v. Laird*, 846 S.W.2d 895, 905 (Tex. App. 1993, writ denied) (holding that § 27.01 did not apply when plaintiff had not met certain conditions precedent in order for the stock options to begin vesting). They did not purport to convey stock or even promise a conveyance in the future. They merely gave Ginsburg the option, at some later point, of converting ICC promissory notes (i.e., ICC debt owed to Ginsburg) into ICC Class B Units (i.e., shares of ICC stock). Because Ginsburg has not plausibly pleaded that there was a contract for the sale of stock, the court grants defendants' motion to dismiss his § 27.01

claim.[25]

IX

Ginsburg alleges that defendants are liable for violating the Illinois Securities Law of 1953, 815 ILCS 5/12(F).

In their motion to dismiss, defendants contend that Ginsburg's fraud-based claims—presumably including his claim under the Illinois Securities Law—fail as a matter of law. They do not, however, identify any particular pleading defect concerning Ginsburg's claim under the Illinois Securities Law. Instead, they generally describe the perceived pleading defects in Ginsburg's "federal and state securities law claims," Ds. Br. 16; contend that the elements of a claim under Section 5/12(F) of the Illinois Securities Law "largely mirror" the fraud provisions of SEC Rule 10b-5, *id.*; and state that the Illinois courts look to federal securities fraud case law in interpreting those sections of the Illinois Securities Law. Essentially, defendants state that the pleading is insufficient, and they shift the burden to the court to determine why. The court declines to shoulder this obligation.[26]

---

[25]Because the court is dismissing Ginsburg's § 27.01 claim for the reasons stated, it does not address defendants' contention that the statute only applies to fraudulent misstatements, not omissions.

[26]The court recognizes that it has the authority to consider the sufficiency of the complaint and dismiss an action *sua sponte*, as long as the procedure it employs is fair. *See, e.g., Biggers v. BAC Home Loans Servicing, LP*, 767 F.Supp.2d 725, 733 n.7 (N.D. Tex. 2011) (Fitzwater, C.J.) (noting that district court has authority to consider sufficiency of complaint and dismiss action on its own motion as long as procedure employed is fair, raising ground for dismissal *sua sponte*, and concluding that procedure was fair because court was granting leave to replead). The court declines in its discretion to analyze the sufficiency of this claim in the absence of sufficient briefing by defendants.

Accordingly, although the pleading defects that the court has identified above with respect to Ginsburg's other fraud-based claims cast some doubt on whether the fourth amended complaint plausibly pleads a claim under the Illinois Securities Law of 1953, the court declines to dismiss this claim in light of defendants' failure to point to any specific deficiency. Defendants' motion to dismiss Ginsburg's claim for violation of the Illinois Securities Law of 1953 is therefore denied.

X

Finally, the court addresses Ginsburg's civil RICO claim.

A

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). "'Reduced to their simplest terms, the essential elements of a [civil] RICO claim are: (1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'" *Orthoflex, Inc. v. ThermoTek, Inc.*, 2012 WL 2864510, at *2 (N.D. Tex. July 12, 2012) (Fitzwater, C.J.) (quoting *Larrew v. Barnes*, 2002 WL 32130462, at *1 n.1 (N.D. Tex. Aug. 27, 2002) (Kaplan, J.), *rec. adopted*, 2002 WL 32130462 (N.D. Tex. Sept. 17, 2002) (Fitzwater, J.)), *appeal docketed*, No. 16-11381 (5th Cir. Sept. 16, 2016).

"Section 1961(1)(B) defines 'racketeering activity' according to whether it constitutes

'any act which is indictable' under several specified sections of title 18 of the United States Code, [two] of which [are] mail fraud [and wire fraud]." *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.) (citations omitted). "To establish a pattern of racketeering activity, [plaintiff] must allege (1) the predicate acts of racketeering activity, and (2) a pattern of such acts." *Orthoflex, Inc.*, 2012 WL 2864510, at * 2 (citing *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993)). A pattern of racketeering activity includes two or more acts of racketeering activity. *See* 18 U.S.C. § 1961(5). "[A] 'pattern' requires both that the acts are 'related' to each other and that they have 'continuity.'" *Burzynski*, 989 F.2d at 742. "It is this factor of *continuity plus relationship* which combines to produce a pattern." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (citation omitted). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (citations omitted). Continuity requires that the related acts "constitute or threaten long-term criminal activity." *Burzynski*, 989 F.2d at 742 (citing *H.J. Inc.*, 492 U.S. at 239). Continuity can be proved by "a closed period of repeated conduct, or . . . past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "A closed period of conduct may be demonstrated 'by proving a series of related predicates extending over a substantial period of time,'" while "[a]n open period of conduct involves the establishment of 'a threat of continued racketeering activity.'" *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (citing *H.J. Inc.*, 492 U.S. at 242).

B

Defendants move to dismiss Ginsburg's civil RICO claim, contending that Ginsburg "has wholly failed to plead any of the elements necessary to state a claim for RICO in his one-paragraph claim," Ds. Br. 23; that Ginsburg's fraud allegations subsumed within the RICO claim do not meet the heightened pleading standard of Rule 9(b); that under the PSLRA, conduct that would have been actionable as fraud in the purchase or sale of securities cannot constitute an actionable predicate act under RICO; that Ginsburg does not plead sufficient facts to show a predicate act, a pattern of racketeering activity, or an enterprise; and that Ginsburg does not plead facts to distinguish between the persons engaged and the alleged RICO enterprise.

Ginsburg responds that he has sufficiently pleaded that ICC is an enterprise engaged in or affecting interstate commerce due to ICC's interstate activities involving the sale and purchase of securities; that he had pleaded that McGraw is a person associated with (and distinct from) ICC due to McGraw's role as the sole owner of one of ICC's two members; that he has alleged a clear pattern of racketeering activity by alleging that McGraw committed two or more related acts of mail fraud, wire fraud, and/or fraud in the sale of securities by fraudulently obtaining funding from him on January 19, 2016 and again on March 16, 2016; that "McGraw's on-going pattern of deceit, over-inflation of projected earnings, and under-estimation of known risks in his effort to obtain funding for ICC demonstrate a clear threat of continued racketeering activity," P. Br. 24; and that the fourth amended complaint adequately pleads a legally sufficient nexus between McGraw, ICC, and

the racketeering activity.

C

The court concludes that the fourth amended complaint fails to state a plausible civil RICO claim against defendants because it does not adequately plead a pattern of racketeering activity.[27] "Continuity cannot be established by multiple acts of fraud that are part of a single transaction." *Orthoflex, Inc.*, 2012 WL 2864510, at *3 (citing *Word of Faith*, 90 F.3d at 123); *see also Burzynski*, 989 F.2d at 743 ("All of the alleged predicate acts took place as part of the *Burzynski I* litigation, which has ended. . . . The conduct did not constitute or threaten long-term criminal activity."); *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1464 (5th Cir. 1991) ("[T]here is no threat here of continued criminal acts. [Defendant's] acts which were alleged to have deprived [plaintiff] of a property interest were, when completed, without threat of repetition."); *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 244 (5th Cir. 1988) ("Delta has alleged as a pattern of racketeering activity nothing more than numerous predicate acts which were necessary segments of an otherwise legitimate [merger].").  When this is the case, "[t]he conduct d[oes] not constitute or threaten long-term criminal activity." *Burzynski*, 989 F.2d at 743; *see also Calcasieu*, 943 F.2d at 1464 ("Short-term criminal conduct is not the concern of RICO.").    Although the court has dismissed most of Ginsburg's fraud claims, it will assume *arguendo* that Ginsburg has

---

[27]In dismissing Ginsburg's civil RICO claim on the basis that Ginsburg has failed to plead a pattern of racketeering activity, the court does not suggest that Ginsburg has adequately pleaded any of the other required elements of his claim.  It is sufficient to dismiss the civil RICO claim on this basis alone.

adequately pleaded predicate acts of "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).[28] Even though Ginsburg alleges multiple allegedly fraudulent misstatements in his fourth amended complaint, his RICO claim actually appears to be based on only two predicate acts: fraud in connection with the January Note, and fraud in connection with the March Note. Ginsburg does not assert that defendants committed any criminal activity beyond these two instances of fraud, or that defendants made any fraudulent misrepresentations after May 6, 2016.[29] In other words, Ginsburg's allegations are limited to the contention that, over the span of approximately five months, defendants made various misstatements to him in order to persuade him to invest in their medical marijuana business, and that, in January 2016 and March 2016, he executed promissory notes in reliance on defendants' misrepresentations. He does not plead any acts of fraud or other criminal activity

---

[28]In *Affco Investments 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 189 (5th Cir. 2010), the Fifth Circuit explained that, as part of the PSLRA, Congress "barr[ed] civil RICO claims based on 'any conduct that would have been actionable as fraud in the purchase or sale of securities.'" *Id.* (quoting 18 U.S.C. 1964(c)). Accordingly, Ginsburg's civil RICO claim is also subject to dismissal to the extent it is based on conduct that would have been actionable as fraud in the purchase or sale of securities. *Id.*

[29]Ginsburg alleges that, on May 6, 2016, McGraw emailed him an Investor Presentation "in preparation for the round of Class C Unit-convertible notes" that failed to disclose material, firm-specific adverse facts that affect the validity or plausibility of ICC's cash flow predictions and failed to disclose ICC's known risks, the probability that such risks would materialize, or the anticipated magnitude of such materialization. 4th Am. Compl. ¶ 15. But he does not allege that he (or anyone else) acted in reliance on these allegedly fraudulent misstatements or otherwise plead the elements of a claim for fraud in connection with the Investor Presentation. Because Ginsburg does not plausibly plead (or even argue in his response brief) that defendants' actions in connection with the Investor Presentation constituted racketeering activity (such as, for example, wire or mail fraud), the court has not considered whether the allegations in ¶ 15 plead a third predicate act. But even if they did, the outcome would be the same.

that occurred after May 6, 2016 (the date McGraw emailed the Investor Presentation), he does not plead that defendants targeted any other potential investors with their allegedly fraudulent misrepresentations, and he does not allege facts that would suggest any threat of continued criminal activity. *Cf. Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) (holding that there was continuity because, "[u]nlike . . . precedents identifying a single illegal transaction, there are multiple victims, and there is no reason to suppose that this systematic victimization allegedly begun in November 2000 would not have continued indefinitely had the Plaintiffs not filed this lawsuit"). As in *Word of Faith*, the alleged acts of fraud were all part of a single, allegedly lawful endeavor—the collection of funds to cover expenses for defendants' medical marijuana business—and there is no suggestion that, had Ginsburg not filed this lawsuit, the alleged criminal activity would have continued indefinitely. *See Word of Faith*, 90 F.3d at 123. In sum, Ginsburg has failed to plausibly plead the requisite continuity under RICO. *See Paul v. Aviva Life & Annuity Co.*, 2011 WL 2713649, at *6 (N.D. Tex. July 12, 2011) (Boyle, J.) ("Plaintiffs have not alleged facts of any other criminal activity by the alleged enterprise beyond the marketing and sale of a benefit trust funded by a cash-value whole life insurance plan. All of the predicate acts pleaded were part and parcel of the sale of Paul Plaintiffs' particular 419A(f)(6) plan. Therefore, Plaintiffs have failed to show that Aviva poses a continuing threat as a RICO person."). Accordingly, the court grants defendants' motion to dismiss Ginsburg's RICO claim.

Although the court is in part granting defendants' motion to dismiss, it will permit Ginsburg to replead.

First, as the court explained in *In re American Airlines, Inc., Privacy Litigation*, 370 F.Supp.2d 552 (N.D. Tex. 2005) (Fitzwater, J.), "'district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.'" *Id.* at 567-68 (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)). There is no indication that the defects in the fourth amended complaint are in all respects incurable,[30] and Ginsburg explicitly requests the opportunity to replead if the court concludes that he has insufficiently pleaded one or more of his claims. *See* P. Br. 25 (citing *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d at 567-68).

Second, "[t]his court's approach in cases decided under the PSLRA has been to allow plaintiffs at least one opportunity to replead after the court has filed an opinion identifying defects in a complaint." *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, ___ F.Supp.3d ___, 2017 WL 3437215, at *25 (N.D. Tex. Aug. 10, 2017) ( Fitzwater, J.).

Third, although Ginsburg is on his fourth amended complaint, the court considers this memorandum opinion and order to be the first that alerts him to the court's conclusions about

---

[30]For example, it is questionable whether Ginsburg can by amended pleading alone plausibly plead a claim under Tex. Bus. & Com. Code Ann. § 27.01.

the deficiencies in his complaint and his first opportunity to cure the deficiencies that the court has identified.

The court therefore grants Ginsburg 28 days from the date this memorandum opinion and order is filed to file a fifth amended complaint.

\*    \*    \*

Accordingly, for the reasons explained, defendants' motion to dismiss is granted in part and denied in part, and Ginsburg is granted leave to replead.

**SO ORDERED**.

November 13, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE